UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**LAURA M. CISKE,**

    Plaintiff,

    v.                                           Case No. 20-CV-1154

**KILOLO KIJAKAZI,**
Acting Commissioner of Social Security[1],

    Defendant.

## DECISION AND ORDER

Laura M. Ciske seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her application for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

On March 1, 2018, Ciske filed an application for SSI, alleging disability beginning May 1, 2014 (Tr. 17)[2] due to bipolar disorder, anxiety (panic attacks), depression, and thyroid dysfunction (Tr. 224). Ciske's application was denied initially and upon reconsideration. (Tr. 17.) Ciske filed a request for a hearing, and a hearing was held before an Administrative Law

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's recent appointment as acting commissioner.
[2] SSI is not payable prior to the month following the month in which the application was filed, *see* 20 C.F.R. § 416.335, thus, the ALJ must determine disability from March 1, 2018 through the date of the decision.

Judge ("ALJ") on October 8, 2019 (Tr. 38–68.) Ciske testified at the hearing, as did Ellen Levine, a vocational expert. (Tr. 38.)

In a written decision issued October 25, 2019, the ALJ found that Ciske had the severe impairments of degenerative disc disease, persistent postural-perceptual dizziness, anxiety, and depression. (Tr. 19.) The ALJ found that Ciske did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 19–21.) The ALJ further found that Ciske had the residual functional capacity ("RFC") to perform light work, with the following limitations: never climb ladders, ropes, or scaffolds; occasionally balance; never work at unprotected heights or operate a motor vehicle; perform simple, routine, and repetitive tasks; make simple work-related decisions; occasionally interact with co-workers and supervisors; and incidentally interact with the public. (Tr. 22.)

While Ciske had no past relevant work, the ALJ found that given her age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that she could perform. (Tr. 29–30.) As such, the ALJ found that Ciske was not disabled since her application date of March 1, 2018. (Tr. 30.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Ciske's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not

conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

2. *Application to This Case*

While Ciske does not dispute the ALJ's determination of her physical limitations, she raises a host of challenges to the ALJ's consideration of her mental impairments, including: erroneously citing her subjective mental health systems; failing to consider her bipolar disorder; failing to properly account for her moderate limitations in concentration, persistence, or pace; failing to properly consider the opinions of her treating mental health providers; and failing to properly account for her social anxiety limitations in the RFC. (Pl.'s Br., Docket # 14.)

Rather than addressing each of Ciske's alleged errors in turn, I find it more prudent to generally address the ALJ's assessment of Ciske's mental health impairments. As an initial matter, because Ciske applied for SSI, the relevant time period begins with her application date. However, Ciske is a relatively young claimant (25 years old at the time of her application) who alleges mental health issues dating back to childhood. In determining RFC, the ALJ must consider *all* of the relevant evidence in the case record; even records pre-dating the alleged onset date to the extent those records shed light on her conditions during the relevant time period. *See Jesus P. v. Saul*, No. 19 C 2271, 2020 WL 3268515, at *5 (N.D. Ill. June 17, 2020) ("Evidence that pre-dates [claimant's] amended alleged onset date and post-dates the DLI may be probative to the extent it sheds light on the nature and severity of his condition during the relevant period.").

With that principle in mind, it is useful to consider the entirety of the record preceding Ciske's application date. In September 2012, when she was 19 years old, Ciske was admitted to the hospital on emergency detention from the Milwaukee County Behavioral Health Division after cutting her left wrist with a razor blade while on the telephone with the suicide crisis center. (Tr. 334–35.) The records indicate that Ciske was "known to the behavioral health unit from an admission last August." (Tr. 334.) After spending approximately five days in the hospital, Ciske's suicidal ideations resolved, she felt "ready to leave the hospital," and was discharged. (Tr. 335.) Less than one year later, in May 2013, Ciske was voluntarily admitted to the Aurora Psychiatric Hospital for approximately six days after her parents reported her missing after being unreachable for 12 hours. (Tr. 333.) During this hospitalization, records indicate that Ciske had been scheduled to start a new job two days prior. (*Id.*) Upon discharge, while Ciske continued having suicidal thoughts, she declined

intensive inpatient care because she felt it would "conflict with starting a new part-time job which she felt was more important for her transition to adulthood." (Tr. 332.) The discharging doctor found that "[g]iven the patient's good symptomatic improvement and desire for autonomy[,] will support transition to outpatient followup [sic] at her part-time job." (*Id*.)

In February 2014, Ciske's treating therapist referred her to a day-treatment program at Waukesha Memorial Hospital to address her anxiety symptoms, suicidal ideation, and urges to self-harm. (Tr. 327.) Ciske was started on a low dose of gabapentin to address her "significant anxiety," but it had "limited effect" and she was encouraged to increase the dose. (Tr. 328.) In June 2015, Ciske was again hospitalized for approximately three days after a suicide attempt in which she cut her left wrist, requiring sutures. (Tr. 336.) Upon discharge, Ciske felt a lot better and was motivated for outpatient treatment. (*Id.*)

Subsequent to the June 2015 hospitalization, Ciske continued to struggle with depression, anxiety, and suicidal ideation. In October 2017, Ciske reported alternating between depression and feeling "okay" several times a day and noted that she struggled while at a conference in Atlanta, having to skip half a day due to anxiety. (Tr. 356.) Ciske continued to endorse passive suicidal ideation, depression, and social anxiety. (Tr. 356–58.)

In March 2018, Ciske stated that her anxiety was not "too bad," but that she also had not been going out much. (Tr. 359.) Ciske treated for her mental health symptoms four times in April 2018, stating that she was fearful of making telephone calls (Tr. 409) and was feeling high anxiety (Tr. 360, 412). Ciske's treatment was quiet for the next few months; however, during a consultative examination in October 2018, she reported that she had not been attending her therapy "lately" because of her anxiety. (Tr. 393.) In September, Ciske presented with an anxious, labile, flat, and depressed affect and reported experiencing

5

negative thoughts and suicidal ideation. (Tr. 415.) Also in October 2018, Ciske reported working sporadically driving for GrubHub (Tr. 399); however, she reported later that month that she had not worked for GrubHub since August and was experiencing anxiety about interacting with people (Tr. 416). By the end of October, Ciske reported not leaving her apartment for one week, having to force herself to go out, and did some pet sitting. (Tr. 417.)

In December 2018, Ciske began treating with Sara DeGrave, LPC. (Tr. 600.) At the beginning of January 2019, Ciske reported having both an upcoming job interview and plans to engage in a social outing, both prospects of which were causing her significant anxiety. (Tr. 606.) Ciske ended up not attending either the job interview or the party and noted that her anxiety was behind not pursuing activities such as employment. (Tr. 607.) Later that month, Ciske addressed her difficulties seeking and obtaining employment due to her anxiety at length with her therapist (Tr. 609), nothing that she wanted and needed to find work, but continued to avoid taking the necessary steps due to anxiety (Tr. 611). In March through May 2019, Ciske did report starting a new job, working "fairly consistently," (Tr. 619), and feeling motivated. (Tr. 474, 617, 621).

On May 13, 2019, Ciske reported having an upcoming job interview that evening and scheduled a follow-up therapy appointment for May 27. (Tr. 627.) Ciske, however, never attended the May 27 therapy appointment and reported to her treating psychiatrist that she had an "anxiety attack" on May 20, consisting of shaking and crying for thirty minutes. (Tr. 621.) When Ciske returned to therapy on June 19, 2019, she reported experiencing "significant stress" since she was last seen and that although she was hired for the job, she did not show up due to her anxiety. (Tr. 629.) Ciske reported that she was hired to start another job that weekend, but was feeling overwhelmed and unable to cope. (*Id.*) She reported having

6

Case 2:20-cv-01154-NJ    Filed 09/10/21    Page 6 of 10    Document 20

an inability to take significant action, but knew she needed to return to counseling to address the issues. (*Id.*) On June 24, Ciske stated that she attended an orientation for a new job, and her primary concern was starting and maintaining the job. (Tr. 631.) However, on July 1, Ciske reported that she left the job after the second day of work, feeling unable to work. (Tr. 633.) On July 8, Ciske stated that she was unsure whether she wanted to return for therapy, and would call when she was ready to schedule an appointment. (Tr. 635.)

Approximately one week later, Ciske presented again to the Aurora Psychiatric Hospital to enroll in the Partial Hospitalization Program, an intensive outpatient program lasting about seven days. (Tr. 479, 556.) During the course of her treatment, Ciske stated that her main goal was to get a job and work; but recognized that her anxiety continued to prevent her from reaching her goals. (Tr. 559.) On July 23, Ciske noted that she had a job interview and was offered the job on the spot. (Tr. 578, 581–82.) She acknowledged having anxiety about the job, especially because she would have to deal with customers (Ciske later testified that the job was at Starbucks, Tr. 57), but was excited and believed she could succeed (Tr. 597). However, Ciske testified that while she tried working for one day, she found it so overwhelming that she could not focus on what the trainer was saying and her anxiety was so bad that she hid in the back and did dishes until it was time to leave. (Tr. 57.) Ciske further testified that she had an anxiety attack when she returned home that night. (*Id.*)

While Ciske faults the ALJ for failing to consider her bipolar disorder or her limitations in concentration, persistence, or pace, these are not the primary impairments affecting her ability to work. Rather, her extreme social anxiety, both per her own testimony and the record evidence, is what prevents her from working. In fact, the record is clear that while Ciske desires to work and has made multiple attempts to work, her social anxiety disorder has

7

prevented the success of all the attempts. And while the ALJ does limit Ciske to incidental interaction with the public, he only limits her to occasional interaction with co-workers and supervisors. (Tr. 22.) "Occasionally" is defined as occurring from very little up to one-third of the time (SSR 83-10); while the ALJ defined "incidental" contact as "fleeting," meaning "it would not be part of this person's regular job duties to interact with the general public." (Tr. 65.) The evidence of record, however, does not support Ciske's ability for occasional, as opposed to incidental, contact with supervisors and co-workers. Ciske failed every single job attempt, her most recent one failing because her interaction with her job trainer caused such anxiety that she could not focus and ended up retreating to the back of the store until her shift was over. (Tr. 57.) Ciske has taken medication for anxiety for years; however, the record supports her testimony that the anxiety "hasn't changed much from the medications." (Tr. 56.) And Ciske clearly is actively addressing her social anxiety issues in therapy in an attempt to stabilize it enough to work. Perhaps Ciske's progress in therapy will eventually get her to that point. But I do not find the record supports the ALJ's finding that Ciske can sustain occasional contact with supervisors and co-workers.

Furthermore, the records on which the ALJ relies in discounting her symptoms of disabling anxiety fail to account for her symptoms properly or accurately. For example, the ALJ relied on her ability to travel to a conference in Atlanta in August 2017 to conclude that Ciske was "mentally able to travel," (Tr. 25) while completely ignoring the fact that she had to skip half a day of the conference due to her anxiety (Tr. 356). The ALJ further states that Ciske was able to "leave her home daily," would spend time with friends and family, and had no issues getting along with co-workers. (Tr. 26.) But this does not capture the picture of Ciske's social anxiety disorder. For one, Ciske did not state she "left her home daily," (i.e.,

that she went out in public daily). Rather, she wrote on her Adult Function Report that she went outside daily. (Tr. 249.) One can go outside without interacting with others. Further, as Ciske and her mother both stated, she does not have difficulty interacting with those she is close to and comfortable with, like her family and close friends. (Tr. 395.) Nor does she fight or have conflict with people; rather, her claim, which the record supports, is that she experiences social anxiety when out of her home and dealing with strangers. (*See id*.) Again, this can be seen by Ciske's canceling of plans, skipping therapy appointments and half a day's conference, and her multiple failed attempts at employment.

Thus, because I find the ALJ erred in his consideration of Ciske's social anxiety disorder, the case will be remanded for further action consistent with this opinion.

## CONCLUSION

Ciske seeks reversal and remand of this case on several alleged grounds of error. I agree the ALJ erred in his consideration of Ciske's social anxiety disorder. Thus, the Commissioner's decision is reversed and the case will be remanded for further proceedings consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of September, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge